## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

-------------------------------------------------------------------x

BOAZ LISSAUER, on behalf of himself
and others similarly situated,

Case No. **2:07 CV 127 8**

Plaintiff,

-against-

RMG TECHNOLOGIES, INC.,
NATIONAL EVENT COMPANY II, LLC,
DESIGNER TICKETS AND TOURS, INC.
d/b/a LASVEGASTICKETS.COM, and
JOHN DOES 1-100

Defendants

-------------------------------------------------------------------x

### CLASS ACTION COMPLAINT

Plaintiff Boaz Lissauer, alleges the following upon information and belief, except as to

allegations concerning plaintiff or his counsel, which allegations are made upon plaintiff's

personal knowledge. Plaintiff's information and belief is based upon, among other things, the

investigation undertaken by his attorneys, which investigation has included, without limitation:

review and analysis of (a) the Amended Complaint in *Ticketmaster LLC v. RMG Technologies,*

*Inc. et al*. No. CV 07-2534-ABC (JCx) (C.D. Cal.) (the "Ticketmaster FAC"); and (b) relevant

articles that appeared in newspapers, magazines and other publications concerning the conduct

alleged herein. Plaintiff believes that substantial evidentiary support will exist for the allegations

set forth herein after a reasonable opportunity for discovery.

### JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over the federal claims in this

Complaint pursuant to 28 U.S.C. Sections 1331 and 1338(a) and 18 U.S.C. Section 1964(c), and

has jurisdiction over the other claims in this Complaint under Ohio law pursuant to 28 U.S.C. Section 1367(a).

2. Venue is proper in this Court pursuant to 28 U.S.C. Sections 1391(b) and 1400 and 18 U.S.C. Section 1965, in that a substantial part of the events giving rise to the claims occurred in this judicial district, RMG's principal place of business is within this judicial district, and RMG transacts business in this judicial district.

**SUMMARY**

3. This class action is brought on behalf of a class (the "Class") of consumers who purchased tickets from ticket brokers (the "Broker Defendants") who, in turn, initially purchased the tickets from Ticketmaster LLC ("Ticketmaster") by means of an illegal conspiracy that violated the Computer Fraud and Abuse Act (the "CFAA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Digital Millennium Copyright Act (the "DMCA"), and the common law, as a result of which Plaintiff and Class members paid artificially inflated prices for said tickets.

4. Ticketmaster sells tickets for entertainment and sports events on behalf of its clients to the general public through a variety of means, including Ticketmaster's website, ticketmaster.com. The Terms of Use for Ticketmaster's website prohibit, among other things, use of the website for commercial purposes, use of automated devices such as bots and spiders to search for and purchase tickets, excessive requests for web pages and other abusive uses of the site, and purchasing quantities of tickets that exceed stated per customer ticket limits. To maintain the integrity of its website and prevent abuse, Ticketmaster employs a variety of security features on its website, including a feature commonly known as "CAPTCHA", which is designed to detect automated devices and prevent them from purchasing tickets.

5.     Since at least as early as 2004, Defendant RMG marketed and sold an application that enabled RMG's customers – the Broker Defendants – to conspire with RMG to use automated devices to unlawfully enter into and navigate through Ticketmaster's website and improperly procure large quantities of tickets for the purpose of reselling them at a profit. RMG defendants conspired to assist the Broker Defendants to circumvent Ticketmaster's security measures. Aware that their activities violated federal and state laws and have caused substantial damage to Ticketmaster and the Class, Defendants nevertheless systematically attempted to conceal their misconduct by, among other means, carefully screening RMG's customers to ensure that none of them had any affiliation with or loyalty to Ticketmaster that would expose Defendants' illegal conspiracy and conduct.

6.     These deceptive and improper actions not only harmed Ticketmaster but also harmed Class members who sought to lawfully purchase tickets through Ticketmaster's website. By using automated devices provided by RMG, which can navigate a website and complete transactions more quickly than Class members could, the Broker Defendants and RMG deprived Class members the opportunity to purchase tickets at face value, a problem which was compounded through RMG knowingly and intentionally facilitating its Broker Defendant customer's ability purchase quantities of tickets far that vastly exceeded the contractual per customer ticket limits Ticketmaster required.

7.     As a result of the exposure of their illegal and conspiratorial conduct, RMG and the Broker Defendants were preliminary enjoined in the Central District of California from creating, trafficking in, facilitating the use of or using computer programs or other automatic devices to circumvent the technological copy protection systems in Ticketmaster's website, and purchasing or facilitating the purchase of tickets from Ticketmaster's website for the commercial

3

purpose of reselling such tickets.

8.    Plaintiff and the Class therefore assert claims against Defendants for violations of the within pled federal and common law.  As relief, Plaintiff and the Class seek compensatory damages, treble damages, punitive damages, disgorgement of Defendants' ill-gotten gains, imposition of a constructive trust, and recovery of attorneys' fees and costs incurred by Plaintiff and the Class to prosecute this lawsuit.

## THE PARTIES

9.    Plaintiff Boaz Lissauer is a New Jersey resident.

10.    On February 26, 2007 Plaintiff purchased tickets for a concert to be performed by the rock band The Police at Madison Square Garden in New York City on August 1, 2007 through TicketLiquidator.com, an on-line "market-maker" for ticket brokers. According to TicketLiquidator's website, TicketLiquidator does not actually purchase tickets, but merely serves as a conduit for various brokers as well as individual consumers to buy and sell tickets.

11.    Despite several attempts to do so, Plaintiff was unable to purchase concert tickets directly through Ticketmaster.

12.    Although the face value of each ticket purchased by Plaintiff (which were situated in the very top level of the concert venue, known in slang terms as "nosebleed seats") was $63.00, Plaintiff paid $195 for each ticket exclusive of fees and commissions.

13.    Plaintiff's receipt for the tickets, attached hereto as Exhibit "A" discloses that the original purchaser was defendant National Event Company, a ticket broker described further below.

14.    Defendant RMG Technologies, Inc. is a Delaware corporation with its principal place of business in Steubenville, Ohio.  RMG does business as, among other things,

4

ticketbrokertools.com. Plaintiff is informed and believes, and based thereon alleges, that RMG conspired to effect the misconduct alleged herein through its President, C.J. Garibay, and other employees, including without limitation Ed Garibay, Shaun McKeegan, Jay Hasman, and Nathan Mitchell.

15. Defendant National Event Company II LLC d/b/a National Event Company ("NECO") is a ticket broker with its principal place of business at 1430 Broadway, New York, NY and sells tickets to various events nationally through its website, www.neco.com. NECO is the original purchaser of Plaintiff 's tickets.

16. On information and belief, NECO conspired with RMG to engage in the illegal conduct described herein. *Inter alia*, NECO's internet website represents (in response to questions on how it obtains its tickets) "How do we do it? **Using cutting edge technology, coupled with buying directly from the source**, National Event Company creates memorable experiences for every sports, concert and cultural event." (Emphasis supplied.)

17. Defendant Designer Tickets and Tours, Inc. ("DTT") d/b/a LasVegasTickets.com is a ticket broker incorporated in California maintaining principal offices at 5030 Paradise Road, #B108, Las Vegas, NV 89119-1227, and sells tickets through its internet website www.ticketsguaranteed.com. DTT conspired with RMG and the Broker Defendants to engage in the illegal conduct described herein. DTT is currently a defendant in a lawsuit pending in the United States District Court for the Central District of California brought by Ticketmaster for the illegal conduct described herein. On October 18, 2007, the District Court denied DTT's motion to dismiss Ticketmaster's First Amended Complaint (the "Ticketmaster FAC") under Fed. R. Civ. P. 12(b)(6).

18. The true names, residences and capacities, whether individual, corporate or

otherwise, of defendants John Does 1 through 100 (collectively, the "Does") are unknown to Plaintiff, who therefore sues those defendants under such fictitious names. The Does are Broker Defendants who used RMG's automated devices to access Ticketmaster's website, as well as agents and employees of RMG, and in doing the things hereinafter alleged, each of the Does was acting within the course and scope of such agency and employment and with the knowledge, consent and approval of RMG and each other. Each of the Does is responsible in some manner for the acts alleged herein and for the damages that Plaintiff and the other members of the Class have sustained. Plaintiff will amend this Complaint to show the true names and capacities of the Does when they are ascertained.

19. At all times relevant hereto, each Defendant conspired with, acted in concert and active participation with, and aided and abetted every other Defendant in committing the wrongful acts alleged in this Complaint. At all times relevant hereto, each of the Defendants knew, or consciously avoided knowing, that the other Defendants were engaged or intended to engage in conduct that violated Plaintiff's and the Class's rights and also violated federal and common law.

## CLASS ACTION ALLEGATIONS

20. Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(b)(1) and (b)(3) on behalf of the Class, consisting of all persons who (1) purchased tickets from any Broker Defendant at artificially inflated prices for events from January 1, 2004 through October 15, 2007 for events in which Ticketmaster was the exclusive primary seller for the event.

21. Excluded from the Class are Defendants, members of the immediate family of the individual defendants, any subsidiary, affiliate or control person of such person or entity, officers

and directors or employees of defendants, and the legal representatives, heirs, successors, or assigns of each such excluded party.

22. The Class satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements delineated in Fed. R. Civ. P. 23.

23. The members of the Class are so numerous that joinder of all members is impracticable. Although the precise number of Class members is unknown to Plaintiff at this time and can be determined only by appropriate discovery, it is reasonably estimated that the Class consists of tens of thousands of members.

24. Common questions of law and fact exist as to all members of the Class that predominate over any questions that may affect only individual members. The questions of law and fact common to the Class include, but are not limited to

    a. whether Defendants are properly within the jurisdiction of this court;

    b. whether Defendants and their co-conspirators were associated-in-fact as an enterprise as defined in 18 U.S.C. § 1961(4);

    c. whether Defendants and their co-conspirators engaged in a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5);

    d. whether the conduct of the defendants and their co-conspirators violates 18 U.S.C. § 1962(c);

    e. whether defendants conduct violated the CFAA or the DMCA;

    f. whether defendants and their co-conspirators committed RICO predicate acts or conspired to violate the RICO statute;

    g. whether defendants acted with the requisite mental state;

    h. whether Plaintiff and the Class are intended third-party beneficiaries of Ticketmaster's contracts with Defendants;

    i. whether defendants fraudulently concealed their conduct;

    j. whether defendants were unjustly enriched;

           k.   whether Plaintiff and the Class suffered an injury to their property caused by the conduct of the defendants and their co-conspirators;

           l.   whether Plaintiff and the Class are entitled to damages; and

           m.  the appropriate measure of damages and other relief.

25.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff was forced to purchase tickets at an artificially inflated price by reason of Defendants' illegal conduct. The harm Plaintiff and all other Class members suffered was proximately caused by the same conduct of Defendants.

26.     Plaintiff will fairly and adequately represent and protect the interests of the Class because Plaintiff has no interests antagonistic to, or in conflict with, the other members of the Class. Plaintiff has retained competent counsel, experienced in securities, antitrust, commercial, human rights, banking, consumer fraud, class action and mass tort litigation, who intend to prosecute this action vigorously.

27.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is numerous and geographically dispersed. While the monetary damages suffered by individual Class members are substantial, the expense and burden of individual litigation make it impractical for individual Class members to seek redress for the wrongful conduct alleged herein.

28.     If class action treatment of these claims were not available, Defendants would retain millions of dollars to which they are not entitled. In this class action, the Court can determine the rights of all Class members with judicial economy.

29.     The Class is readily definable, and can be ascertained after a reasonable opportunity for discovery, including, but not limited to, discovery related to the identity of the Does and their customers, who are all members of the Class. Treatment of this action as a class

8

action will reduce the possibility of repetitious litigation. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## FACTS

### A. Ticketmaster's Ticketing System Is Intended To Create Fair And Equitable Opportunity For Consumers To Purchase Tickets.

30.     Ticketmaster distributes tickets for live entertainment events to Class members on behalf of Ticketmaster's clients, who are venues, promoters, entertainers and sports franchises. Ticketmaster sells tickets via retail ticket outlets, telephone call centers, and Ticketmaster's website, www.ticketmaster.com. Ticketmaster spends substantial time, energy and resources attempting to ensure that its website is current, accurate and easily understood for the benefit of its clients and the public.

31.     Demand for tickets sold through Ticketmaster, including via ticketmaster.com, often exceeds the supply of tickets available for purchase. This can inspire intense competition among Class members and ticket brokers to purchase tickets to the same event when the tickets become available for sale on ticketmaster.com.

32.     Recognizing this competitive reality, Ticketmaster has undertaken various measures intended explicitly to make the ticket buying process as fair and equitable as possible for potential purchasers of tickets, including Class members.

33.     For example, Ticketmaster attempts to regulate the speed with which users may copy the web pages necessary to purchase tickets on ticketmaster.com. Ticketmaster also limits the number of tickets that may be purchased in any single transaction.

34.     Ticketmaster's ticket purchase policy, which can be easily accessed on its website, states explicitly: "When purchasing tickets on Ticketmaster.com, you are limited to a

specified number of tickets for each event (also known as a "ticket limit"). This amount is included on the unique event page and is verified with every transaction. <u>This policy is in effect to discourage unfair ticket buying practices</u>." (Emphasis added.)

35. Ticketmaster's Terms of Use, which, as described below, govern all ticket purchases through the site, incorporates the preceding ticket purchase policy by reference.

36. In addition, Ticketmaster has undertaken measures intended to prevent the use of computer programs or other automated devices – sometimes called software robots or "bots" – which can give users of such devices an unfair advantage over human consumers in the ticket purchasing process. One of those measures is a security computer program, commonly known as "CAPTCHA" , an acronym created and trademarked by Carnegie Mellon University standing for "Completely Automated Public Turing Test To Tell Computers and Humans Apart"), that is designed to distinguish between human users and automated devices.

37. When a user submits a ticket request, a box appears on the screen with random characters partially obscured behind hash marks, which the user is instructed to retype in order to proceed with the ticket request. Most automated devices cannot decipher and retype the random characters, and thus cannot proceed past that screen to complete a ticket transaction.

**B.** **Use Of Ticketmaster's Website Is Subject To Copyright Protections And Contractual Terms Of Use.**

38. Ticketmaster's website is a work of authorship protected by copyright law. Ticketmaster (or its predecessors) has registered versions of its website or portions thereof, with the Copyright Office, as described below:

| **Title** | **Registration No.** | **Date of Registration** |
| --- | --- | --- |
| HTML code for Ticketmaster.com | TX-4-465-209 | February 5, 1997 |

| | | |
|---|---|---|
| Ticketmaster.com<br>Website II | TX-4-905-957 | June 18, 1999 |
| Ticketmaster.com<br>Website III | TX-4-905-956 | June 18, 1999 |
| Ticketmaster.com | TX-5-072-126 | March 17, 2000 |
| Ticketmaster.com: Online<br>Order Search | TX-5-067-039 | May 30, 2000 |
| Ticketmaster.com: Order<br>Information | TX-5-067-040 | May 30, 2000 |
| Ticketmaster.com<br>Ticketmaster.com<br>Website Homepage, Event<br>Ticket Order Pages | TX-5-455-574<br>TXu-1-348-580 | December 29, 2000<br>May 22, 2007 |
| Event Ticket Order<br>Validation Code | TXu-1-348-581 | May 22, 2007 |
| Event Ticket Order<br>Limiting Code | TXu-1-348-582 | May 22, 2007 |

39.     Use of ticketmaster.com by any member of the public is governed by Terms of

Use that are set forth on the website.  In all relevant respects, except for the inclusion of a

liquidated damages provision in 2006, these Terms of Use have been the same from at least as

early as 2003 to the present.

40.     At all relevant times, the home page for ticketmaster.com has contained the

following warning:

> Use of this website is subject to express terms of use which
> prohibit commercial use of this site. By continuing past this page,
> you agree to abide by these terms.

The underlined phrase "terms of use" on the home page is a readily visible hypertext link that,

when clicked, causes the full Terms of Use to appear on the user's screen.  The same message

and related hyperlink to Ticketmaster's Terms of Use appear on almost every webpage on the

website. Thus, a user is repeatedly reminded that use of the site is governed by the Terms of Use, and that continuing to use the site with that knowledge constitutes acceptance of those Terms of Use.

41. To purchase tickets through ticketmaster.com, a user must set up an account with Ticketmaster, and in doing so the user is instructed to review the Terms of Use for the website. Since 2003, it has been necessary as part of the account set-up procedure for the user to expressly consent to the Terms of Use by clicking a button labeled "Accept and Continue."

42. Users of ticketmaster.com also are referred to the Terms of Use when completing a ticket purchase. Users see a web page which states, "*As a user of this website, you agree that you are subject to this website's Terms of Use*," and embedded in this statement is a hyperlink that, when clicked, causes the Terms of Use to appear on the user's screen. During 2006, Ticketmaster added an "Accept and Continue" button at the point of purchase, which requires a user, before completing a ticket purchase, to expressly assent to the Terms of Use by clicking a button labeled "Accept and Continue."

43. Consumers who wish to purchase tickets through ticketmaster.com must navigate through a series of pages on the website by clicking on designated hypertext links on those pages. Viewing Ticketmaster's homepage and clicking on the hyperlinks to reach the various other pages that must be viewed to purchase tickets from the website causes copies of each of those pages to be created and to appear on a customer's computer. Ticketmaster's Terms of Use act as a license agreement that describes, *inter alia,* when and in what circumstances a user is permitted to copy pages of the website, especially those pages that must be viewed to purchase tickets.

44. At all relevant times the Terms of Use have permitted only personal use of the Ticketmaster.com website by consumers, as follows:

12

> **Permitted Use:** You agree that you are only authorized to visit, view and retain a copy of pages of this site for your own personal use... unless otherwise specifically authorized by Ticketmaster to do so.

45.     At all relevant times Ticketmaster's Terms of Use have included a variety of

provisions that prohibit misuse of the website. For example, the Terms of Use have always

prohibited commercial use of Ticketmaster's website, providing in pertinent part as follows:

> **Commercial Use:** No... areas of this site may be used by our visitors for any commercial purposes... Without limiting the foregoing, you may not use this site to resell tickets of any kind [except as permitted on the site itself]... We reserve the right to block access to this Site or Ticketmaster's other services, or cancel a ticket order or ticket with respect to any person believed to be, or believed to be acting in concert with any person who is believed to be, violating the law or these Terms or Ticketmaster's rights, or utilizing automated means to process or place ticket orders, or who has ordered a number of tickets that exceeds the stated limit. Violating any limitations or terms on the Site will be deemed to be a violation of these Terms.

46.     At all relevant times, Ticketmaster, through its Terms of Use, expressly prohibited

the use of bots and other automated means to access ticketmaster.com.  In that regard, the Terms

of Use provide in pertinent part as follows:

> **Access and Interference:** You agree that you will not use any robot, spider or other automatic device, process or means to access the Site. ... You agree that you will not access, reload or "refresh" transactional event or ticketing pages, or make any other request to transactional servers, more than once during any three second interval.

47.     Similarly, at all relevant times, Ticketmaster, through its Terms of Use,

prohibited unauthorized use of its site, providing in pertinent part as follows:

> **Unauthorized Use of the Site:** Any Illegal or unauthorized use of the Site shall constitute a violation of these Terms of Use. You do not have permission to access the Site in any way that violates, or in the course of violating, these Terms of Use. Illegal or unauthorized use of the Site includes, but is not limited to, using the site to

> facilitate illegal ticket sales, unauthorized framing of or linking to
> the Site, or unauthorized use of any robot, spider or other
> automated process on the Site. It shall also be a violation of these
> Terms of Use: (a) for any individual (or group of individuals acting
> in conceit) to request, more than 1000 pages of the Site in any
> twenty-four hour period (hereafter referred to as "Abusive Use").
> ...

48.     Furthermore, as alleged above, Ticketmaster, through its Terms of Use, limited

the number of tickets that a consumer could purchase in a single transaction. At all relevant

times, the Terms of Use contained a hyperlink to, and expressly incorporated, Ticketmaster's

Purchase Policy. The hyperlink to Ticketmaster's Purchase Policy is easily visible and readily

accessible under a heading in the Terms of Use which states 'Ticket Purchase Policy."

Immediately below this heading in the Terms of Use is the following statement: "Please review

the Purchase Policy, which will govern your order or purchase of any tickets through the Site."

Clicking on the "Purchase Policy" hyperlink causes the full Purchase Policy to appear on the

user's screen.

49.     At all relevant times, the Purchase Policy on Ticketmaster's website stated:

> **Amount of Tickets Per Customer or Ticket Limits.** When
> purchasing tickets on Ticketmaster.com, you are limited to a
> specified number of tickets for each event (also known as a "ticket
> limit"). This amount is included on the unique event page and is
> verified with every transaction.   This policy is in effect to
> discourage unfair ticket buying practices.

50.     In sum, at all relevant times, the Terms of Use, including the Purchase Policy,

prohibited users, including Defendants, from, among other things, using the Ticketmaster

website for commercial purposes, using bots and other automated devices to access and navigate

the site and conduct transactions, abusing the Ticketmaster system with excessive requests for

web pages, and purchasing tickets in excess of the per customer ticket limit.

**C.** **Defendants Have Misused And Abused Ticketmaster's Website Directly And By Assisting the Broker Defendants To Do So.**

51. Since at least as early as 2004, Defendants developed, marketed, sold, and used a software application that enables the Broker Defendants to employ automated devices to unlawfully and improperly access Ticketmaster's website and quickly purchase large quantities of tickets in violation of the Terms of Use of ticketmaster.com. These automated devices, which include "auto-workers" and "super-proxy-workers," are designed to, and do, circumvent CAPTCHA and other security measures on Ticketmaster's website.

52. Plaintiff is informed and believes, and based thereon alleges, that the Broker Defendants did not acquire physical possession of or download RMG's devices. Rather, the Broker Defendants logged onto RMG's website, ticketbrokertools.com, by entering a secret user name and password, and then used a suite of devices and products on that website, including auto-workers and super-proxy-workers, to improperly access Ticketmaster's website.

53. Thus each and every illegal ticket purchase from Ticketmaster by any Broker Defendant was executed jointly with RMG.

54. RMG provided a variety of online software schemes to maximize the ability of the Broker Defendants to unlawfully circumvent Ticketmaster's security measures and to accelerate the purchase of numerous tickets in excess of the limited imposed by Ticketmaster that was part of its Terms of Use. Depending on the level of service and features a Broker Defendant purchased from RMG, that Broker Defendant could use multiple bots – sometimes hundreds of them – simultaneously to flood the Ticketmaster website with requests for tickets.

55. On information and belief, if a Broker Defendant encountered any obstacle in securing tickets or circumventing Ticketmaster's security measures, the Broker Defendant could immediately consult with an RMG representative to receive information concerning how to

15

maintain improper access to the Ticketmaster system.

56.    RMG also provided consultation to the Broker Defendants in setting up hardware, telecommunications equipment, and other tools to further expand their illegal invasion of Ticketmaster's website, thus forcing Class members to buy tickets on the secondary market at artificially inflated prices.  Plaintiff is informed and believes, and based thereon alleges, that RMG and its Broker Defendant customers consulted with other Broker Defendants throughout the United States, to lend assistance in establishing or expanding the Broker Defendants illegal ticket-buying operations.

57.    RMG and then-current Broker Defendants carefully screened potential customers of RMG to ensure that they had no affiliation with or loyalty to Ticketmaster.  Indeed, Defendants warned RMG's Broker Defendant customers not to publicize the existence of RMG's ticket-buying services, out of concern that Defendants' illegal activities might be discovered by Ticketmaster.

58.    Instead, if an existing Broker Defendant wanted to recommend RMG's services to another broker, the existing Broker Defendant customer was instructed to provide the name of the potential customer to RMG, so that all Defendants could first screen the potential customer before deciding whether to initiate contact with the potential RMG customer.

59.    Defendants reviewed and consented to Ticketmaster's Terms of Use by accessing www.ticketmaster.com.    In order to design automated devices that can circumvent Ticketmaster's security measures and exploit the Ticketmaster system, the Defendants had to regularly visit Ticketmaster's website.  Like any other visitor to the site, Defendants saw repeated reminders of the Terms of Use and were instructed to review them.

60.    Moreover, Plaintiff is informed and believes, and based thereon alleges, that

16

Defendants purchased tickets on Ticketmaster's website through their automated devices, as part of their ongoing testing of devices, and that Defendants were required to click the Accept and Continue button, thereby expressly confirming their assent to the Terms of Use, when making such ticket purchases.

61.     Plaintiff is informed and believes, and based thereon alleges, that in the course of using RMG's automated devices, Defendants, as well as RMG's customers, repeatedly and systematically requested more than 1000 pages of the website in applicable twenty-four hour periods, accessed, reloaded or refreshed transactional events or ticketing pages and made other requests to transactional servers more than once during applicable three-second intervals.

62.     Moreover, Plaintiff is informed and believes, and based thereon alleges, that the Broker Defendants routinely bought quantities of tickets through Ticketmaster in excess of per-customer ticket limits, and that all or substantially all of these purchases were made for a commercial purpose.

63.     The Ticketmaster system sometimes can detect the presence of an automated device. When that occurs, the system generates a message to the user explaining that the use of automated devices is prohibited.

64.     Plaintiff is informed and believes, and based thereon alleges, that Ticketmaster's system in fact generated such messages in response to automated devices used by Defendants, and that the message is intercepted by and visible to RMG because the access to Ticketmaster's website occurred through RMG's applications. Nonetheless, Defendants ignored the warnings and continued to facilitate the use of automated, devices to unlawfully navigate through the Ticketmaster website and wrongfully acquire tickets.

65.     When the Ticketmaster system detects the presence of an automated device, the

system, in addition to generating the message described above, temporarily disables the automated device.

66. Plaintiff is informed and believes, and based thereon alleges, that Ticketmaster's system in fact temporarily disabled automated devices used by the Broker Defendants, but when that occurred, RMG provided technical assistance to the Broker Defendants to enable them to regain access to the Ticketmaster system. RMG's assistance included helping Broker Defendants to deploy the automated device from a different IP address (Internet Protocol address) thus enabling Broker Defendants to continue with their unauthorized use of the Ticketmaster system.

67. Ticketmaster diligently tried to identify users of bots and other prohibited automated devices. However, the Broker Defendants went to great lengths to disguise their illegal activity.

68. Plaintiff is informed and believes, and based thereon alleges, that RMG assisted the Broker Defendants in evading detection by, among other means, helping Broker Defendants obtain new IP addresses from their Internet Service Providers, and advising the Broker Defendants to remove data and clean out "cookies" from the computers they use when accessing ticketmaster.com, thereby eluding identification by Ticketmaster as repeat visitors to the site.

69. Thus, it was not until quite recently that it became clear that Defendants' unlawfully accessed www.ticketmaster.com and thereafter used prohibited automated devices to improperly acquire ticket.

70. Defendants wrongful conduct resulted in Ticketmaster bringing a lawsuit in the Central District of California, which alleged that the Defendants violated the CFAA, DMCA, RICO, and California state law.

18

71.     On October 15, 2007, the California District Court granted Ticketmaster a preliminary injunction. The Court ordered RMG to cease creating, trafficking in, or facilitating the use of computer programs that allow its clients to circumvent the protection systems in the ticketmaster.com web site. The order also bars RMG from using information gained from access of Ticketmaster's website to create computer programs designed to circumvent Ticketmaster's copy protection and website regulation systems.

72.     In its press release announcing the Court's issuance of the injunction, Ticketmaster stated: "RMG's software allows its clients to buy tickets from Ticketmaster faster than Ticketmaster's human customers can.  RMG's clients are ticket brokers or suppliers to ticket brokers who use RMG's software to buy tickets they can resell to the public at higher prices. *Such actions have blocked consumers from getting those tickets at the 'face' price shown on the ticket*." (Emphasis added.)

73.     Ticketmaster's President and CEO Sean Moriarty further stated: "Ticketmaster is committed to ensuring that *consumers have fair and equitable access to tickets*.  Not only are we doing everything possible to create a secure and positive experience for ticket purchasers, *we are making sure that the public knows it can come to the Ticketmaster web site and access the best available seats at the prices set by the event provider*.  We will not allow others to illegally divert tickets away from fans. *We recognize and respect the necessity and reality of a vibrant resale market, but we will not tolerate those who seek an unfair advantage through the use of automated programs*.

74.     Defendants conduct also led to investigations and lawsuits by the States Attorney Generals of Pennsylvania, Arkansas, and Missouri.

75.     The Missouri Attorney General announced the filing of lawsuits against three

ticket brokers: GoTickets Inc. and Tickets Now Entertainment Group Inc., both of Springfield, Illinois, and Ticket Solutions Inc. of Overland Park, Kansas.

76. The Missouri Attorney General reported that during the course of his office's inquiry, investigators from his office purchased tickets for a "Hannah Montana" concert on line from the three-listed broker defendants for a December 3, 2007 Kansas City show. Investigators paid $254, $257 and $305 for the tickets, which had a face value of either $26 or $56. According to the Missouri Attorney General these Broker Defendants' websites continue to advertise and offer for sale tickets to the concerts at inflated prices ranging from $161 to $2,135.

77. Missouri Attorney General Nixon commented: "These companies are able to employ inappropriate means, *using sophisticated software, to hoard all the tickets to high-demand events and then turn around and sell them at grossly inflated prices*. It's a blatant rip-off of consumers who *attempt to purchase tickets in good faith through the proper means and are met with nothing but frustration*."

**D.    The Wrongful Conduct Has Harmed Plaintiff and the Class.**

78. Plaintiff and the Class were harmed by the use of RMG's automated devices. To meet the demands of consumers and Ticketmaster's own clients, Ticketmaster provided an equitable ticket distribution system intended to provide all consumers with a fair opportunity to acquire the best available tickets for events.

79. Defendants knowing and intentional use of automated devices undermined this effort, because the automated devices navigated through Ticketmaster's website and purchased tickets at a speed that legitimate consumers who do not use such devices, and honored Ticketmaster's terms of service, could not match. As a result, the inventory of tickets available to consumers who did not use such devices was substantially diminished, and resulted in the

20

absence of a level playing field for the purchase of tickets. Indeed, Defendants have been able to purchase up to 80% of the tickets available online for any of the events for which Ticketmaster exclusively sells tickets.

80.     This harm was compounded by the fact that Defendants inundated the Ticketmaster system with thousands of requests for tickets, and each request caused tickets to be placed temporarily on reserve, even if they were not ultimately purchased. While a ticket is on reserve, it is unavailable to any other user of the site. Not only did this further diminish the inventory of tickets for Plaintiff and the Class, but it impedes Ticketmaster's ability to monitor ticket sales activity to make a variety of decisions, including whether to open more seats or move the seats to other distribution channels.

81.     Thus, the artificially high volume of seats revolving in and out of reserve status due to Defendants' illegal conspiracy to use automated devices made it difficult for Ticketmaster to gauge how well tickets for the event were actually selling, which in turn interferes with the Plaintiff's and the Class's ability to make the ongoing decisions that are based on sales activity.

82.     Users of automated devices also block access to the Ticketmaster system by Class members in a variety of other ways.

83.     For example, Ticketmaster's website allocates traffic to various servers through a load balancing program that is designed to ensure consumer requests are processed equitably and that no consumer receives slower service merely because his or her request was directed to one server rather than another.

84.     However, Defendants illegally enabled themselves to bypass the load balancing program and target specific servers directly with thousands of requests, thus interfering with the website's traffic allocation feature and putting many Class members whose requests were

21

allocated to the same server that was targeted by the automated device at risk of slower service.

85.     Furthermore, by accessing the Ticketmaster system at targeted points, Defendants altered the security features of Ticketmaster's website itself designed to protect Class members. Normally, users receive automatic and temporary permission – in effect, a "token" – to make requests on the system. That "token" is automatically revoked if the pace of requests exceeds a certain limit. However, by systematically deleting cookies on the user's system, Defendants were able to constantly assume a new identity and acquire new "tokens" even though Defendants far exceeded the request limit to the detriment of Plaintiff and the Class.

### FIRST CLAIM FOR RELIEF
### Violation Of Digital Millennium Copyright Act, 17 U.S.C. § 1201
### (Against All Defendants)

86.     Plaintiff alleges and incorporates by reference all of the preceding paragraphs.

87.     Defendants are manufacturing, importing, trafficking in and using bots, programs, or other technology, products, services, devices, components, or parts thereof, that are primarily designed and produced to circumvent the technological measures by which Ticketmaster effectively controlled access to its copyrighted website.

88.     These bots, programs, or other technical devices have no commercially significant purpose or use other than to circumvent the technological measures that Ticketmaster uses to control access to its website for the benefit of Class members, and that Defendants created marketed, trafficked in and used those devices for that purpose.

89.     Plaintiff and the Class have suffered significant damages in an amount not presently known with certainty, but which will be proven at trial, as a proximate result of Defendants' above-referenced misconduct.

90.     Plaintiff and the Class are entitled to the range of relief provided by 17 U.S.C.

Sections 1201-1203, including injunctive relief, compensatory or statutory damages, and its costs and attorneys' fees in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
## Violation Of Computer Fraud And Abuse Act, 18 U.S.C. § 1030
## (Against All Defendants)

91.  Plaintiff alleges and incorporates by reference all of the preceding paragraphs.

92.  Ticketmaster, Defendants, and Class members' computers were involved in interstate and foreign communication.

93.  Defendants have knowingly, and with intent to defraud, trafficked in passwords or other information that has been used to access Ticketmaster's website without authorization or in excess of authorized access, in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(6)(A).

94.  Furthermore, Defendants have intentionally accessed Ticketmaster's computers without authorization or in excess of authorized access, and, through interstate or foreign communication, obtained information from those computers, in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C). As a result of this conduct, the Class sustained economic damages of at least $5,000 over a one-year period.

95.  Furthermore, Defendants knowingly, and with intent to defraud, have accessed Ticketmaster's computers without authorization or in excess of authorized access, and by means of such conduct furthered their intended fraud and obtained items of value greater than $5,000 over a one-year period, in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4).

96.  As alleged in more detail above, these violations have damaged Plaintiff and the Class by, among other things, diminishing the inventory of tickets available through

Ticketmaster to Class members, causing artificially high levels of tickets to be placed on reserve and thereby interfering with the transmission of real time sales information to Class members, interfering with and disrupting Ticketmaster's load balancing program and thereby denying service to Class members, and altering website security features through manipulation of request limit monitoring,

97. Under the Computer Fraud and Abuse Act, 18 U.S .C § 1030(g), Plaintiff and the Class are entitled to damages, and other legal and equitable relief as prayed for in this Complaint.

98. This action is timely, in that it is brought within 2 years of the date of the act complained of, or the date of the discovery of the damage.

## THIRD CLAIM FOR RELIEF
### Violation of RICO, 18 U.S.C. § 1962(c)
### (Against all Defendants)

99. Plaintiff alleges and incorporates by reference all of the preceding paragraphs.

100. Defendants have repeatedly and systematically engaged in "racketeering activity" as defined in 18 U.S.C. Section 1961(1) through their violations of 18 U.S.C. Section 1029, which prohibits fraud and related activity in connection with access devices. Defendants have provided devices, along with technical assistance in exploiting such devices, to gain access to numerous customer accounts on Ticketmaster's website without Ticketmaster's consent or permission. Each instance of providing devices constitutes a separate offense under 18 U.S.C. Section 1029.

101. As a separate and independent basis for RICO liability, Defendants have engaged in racketeering activity through their violations of 18 U.S.C. Section 1343, which prohibits wire fraud. RMG repeatedly and systematically communicated with the Broker Defendants via telephone and the Internet and with Ticketmaster's website via the Internet for the purpose

effectuating their fraudulent scheme of providing a means for the Broker Defendants to unlawfully access Ticketmaster's website by means of false representations and omissions and to obtain tickets to which such individuals are not entitled. Each communication via wire constitutes a separate offense under 18 U.S.C. Section 1343.

102.    RMG and the Broker Defendants collectively comprise an "enterprise" as defined in 18 U.S.C. § 1961(4), and Defendants are employed by or associated with that enterprise.

103.    Defendants conduct the affairs of the enterprise through "a pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5). As alleged above, Defendants have engaged in at least two acts of racketeering activity within the last ten years.

104.    Ticketmaster and the enterprise are both involved in interstate commerce.

105.    Accordingly, Defendants have violated, and continue to violate, 18 U.S.C. § 1962(c), which makes it unlawful for any persons employed by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

106.    Plaintiff and the Class were injured in their business or property as a result of this violation of 18 U.S.C. Section 1962(c). Under 18 U.S.C. § 1964, Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages suffered as a result of Defendants' fraudulent actions, and their attorneys' fees and costs in prosecuting this lawsuit.

### FOURTH CLAIM FOR RELIEF
### Violation of RICO. 18 U.S.C. § 1962(d)
### (Against all Defendants)

107.    Plaintiff alleges and incorporates by reference all of the preceding paragraphs.

108.    All Defendants conspired with one another to violate 18 U.S.C. Section 1962(c),

thereby violating 18 U.S.C. Section 1962(d).

109.    Plaintiff and the Class were injured in their business or property by reason of this conspiratorial conduct.

110.    By reason of Defendants' violation of 18 U.S.C. Section 1962(d), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages suffered as a result of Defendants' fraudulent actions, as well as an injunction as prayed for in this Complaint, and its attorneys' fees and costs in prosecuting this lawsuit.

## FIFTH CLAIM FOR RELIEF
### Breach Of Contract
### (Against All Defendants)

111.    Plaintiff alleges and incorporates by reference all of the preceding paragraphs.

112.    At all relevant times, Ticketmaster's Terms of Use stated explicitly that restrictions on using automated devices, and ticket purchase limits, were for the specific benefit of consumer seeking to purchase tickets to events at face value. As such, Plaintiff and the Class were intended third party beneficiaries of Ticketmaster's Terms of Service, which incorporated by reference its ticket purchase policy.

113.    At all relevant times, the home page and most other pages on ticketmaster.com have informed users that their use of the website is subject to express terms and conditions set forth in the Terms of Use, and that by continuing past the page in question, the user expressly and/or impliedly agrees to be bound by those terms. Users have a reasonable opportunity to review the Terms of Use upon first entering the website, and they also have a reasonable opportunity to review the Terms of Use during their use of the site. The link to the Terms of Use is displayed in such a manner as to provide consumers with clear notice of their existence.

114.    Defendants expressly assented to the Terms of Use when setting up accounts on

ticketmaster.com. Moreover, since the middle of 2006, it has been necessary for users of ticketmaster.com to expressly assent to the Terms of Use each time they submit a request to purchase tickets. Thus, Plaintiff is informed and believes that Defendants have repeatedly provided their express assent to the Terms of Use.

115. The Terms of Use prohibit, among other things, commercial use of the site, the use of bots and other automated devices, abusive use of the website, and exceeding per-customer ticket limits. These Terms of Use are fair and reasonable.

116. Ticketmaster, Plaintiff, and the Class performed all conditions, covenants and promises required to be performed by it in accordance with the Terms of Use.

117. Since at least as early as 2004, Defendants repeatedly and systematically breached the Terms of Use by using bots and other automated devices to access the website and buy tickets, by using the website for a commercial purpose, and by buying tickets in quantities that exceed per customer ticket limits. As part of this misuse of Ticketmaster's website, Defendants repeatedly and systematically requested more than 1000 pages of the website in applicable twenty-four hour periods, and accessed, reloaded or refreshed transactional events or ticketing pages and made other requests to transactional servers more than once during applicable three-second intervals.

118. Plaintiff and the Class are third-party beneficiaries of the contract between Ticketmaster and the Defendants insofar as Ticketmaster's stated policies and Terms of Use are explicitly designed to protect consumers against unfair ticket buying practices, such as Defendants' illegal practices. For example, Ticketmaster's Purchase Policy, "Amount of Tickets Per Customer or 'Ticket Limits'" provision states: "When purchasing tickets on Ticketmaster.com, you are limited to a specified number of tickets for each event (also known as a "ticket limit"). This amount is included on the unique event page and is verified with every

transaction. This policy is in effect to discourage unfair ticket buying practices."

119.    Defendants illegal conduct described above foreclosed Plaintiff and the Class from purchasing tickets directly through Ticketmaster.com and caused Plaintiff and the Class to purchase such tickets from Broker Defendants and others at artificially inflated prices.

120.    Plaintiff and the Class have suffered damage as a result of the Broker Defendants' breaches of contract in amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### Intentional Interference with Contractual Relations
### (Against all Defendants)

121.    Plaintiff alleges and incorporates by reference all of the preceding paragraphs.

122.    As alleged above, Ticketmaster's customers were bound by the Terms of Use on Ticketmaster's website and at all relevant times Defendants were aware that Plaintiff and Class members were bound by the Terms of Use. Moreover, at all relevant times, Defendants were aware of the content of the Terms of Use.

123.    The Terms of Use prohibit, *inter alia,* commercial use of the site, the use of bots and other automated devices, abusive use of the website, and exceeding per-customer ticket limits. These Terms of Use are fair and reasonable.

124.    Ticketmaster, Plaintiff, and the Class performed all conditions, covenants and promises required to be performed by it in accordance with the Terms of Use.

125.    By marketing and selling automated devices to circumvent Ticketmaster's security devices and providing tools and assistance to the Broker Defendant to enable them to inundate Ticketmaster's website with requests and excess ticket purchases, Defendants intended to disrupt the performance of the contracts between Ticketmaster, Plaintiff, and the Class.

126.    Since at least as early as 2004, Defendants have repeatedly and systematically

used bots and other automated devices to access the website and buy tickets, have used the website for a commercial purpose, and have bought tickets in quantities that exceed per customer ticket limits. Plaintiff is informed and believes, and based thereon alleges, that as part of this misuse of Ticketmaster's website, the Broker Defendants repeatedly and systematically requested more than 1000 pages of Ticketmaster's website in applicable twenty-four hour periods, and accessed, reloaded or refreshed transactional events or ticketing pages and made other requests to transactional servers more than once during applicable three-second intervals.

127.    Defendants' conduct made it substantially more difficult and expensive for Ticketmaster to perform under those contracts. As alleged in more detail above, these violations have damaged Class members by, among other things, diminishing the inventory of tickets available through Ticketmaster to Class members, causing artificially high levels of tickets to be placed on reserve and thereby interfering with the transmission of real time sales information to Class members, interfering with and disrupting Ticketmaster's load balancing program and thereby denying service to Class members. Thus, Defendants' conduct was a substantial factor in causing harm to Plaintiff and the Class.

## SEVENTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Against All Defendants)

128.    Plaintiff alleges and incorporates by reference all of the preceding paragraphs.

129.    For the reasons set forth above, defendants have been unjustly enriched. During the Class Period, the Defendants used various mechanisms in order to improperly profit at the expense of Plaintiff and the Class, who suffered economic damage as a result of Defendants' conduct.

130.    The Defendants were unjustly enriched by several means including the

overpricing of tickets as part of the conspiracy, and the wrongful receipt of commissions, fees, and surcharges

131.     As a direct and proximate result of Defendants wrongful conduct, Defendants have been unjustly enriched, in an amount to be proved at trial, for which damages and/or restitution and disgorgement are appropriate. Such damages and/or restitution and disgorgement should include a declaration by this Court that the Defendants are constructive trustees for the benefit of Plaintiff and the Class, and an order that defendants convey to Plaintiff and the Class all gross receipts and benefits received or to be received that are attributable to its prior wrongful acts.

## EIGHTH CLAIM FOR RELIEF
### Accounting
### (Against All Defendants)

132.     Plaintiff alleges and incorporates by reference all of the preceding paragraphs.

133.     To the extent that Plaintiff and the Class possess an equitable right to the property unlawfully obtained by Defendants, Plaintiff and the Class request an accounting as to the disposition of all funds received by the Defendants and all information relevant to determining the present value of assets unlawfully obtained by the defendants, and such other and further relief as this Court deems just.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment:

a.     Certifying that the action may be maintained as a class action;

b.     Awarding Plaintiff and the Class restitutionary and/or compensatory damages in an amount to be determined at trial;

c.     Awarding Plaintiff and the Class treble damages in an amount to be determined at trial;

d.      Awarding Plaintiff and the Class  the costs of this litigation, including attorneys'
        fees and expenses; and

e.      Such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a jury trial in this action.


Dated:  December 18, 2007

                                KATZ GREENBERGER & NORTON, LLP


                        By: /s/ Richard L. Norton
                                Richard L. Norton (Ohio Bar No. 0011869)
                                rln@kgnlaw.com
                                105 East Fourth Street
                                4th Floor
                                Cincinnati, Ohio 45202
                                Tel: (513) 721-5151
                                Fax: (513) 621-9285

                                **HARWOOD FEFFER LLP**
                                Robert I. Harwood
                                rharwood@whesq.com
                                Peter M. Overs, Jr.
                                povers@hfesq.com
                                488 Madison Avenue
                                New York, NY 10022
                                Tel.:(212) 935-7400
                                Fax:(212) 753-3630

                                **OSEN & ASSOCIATE, LLC**
                                Joshua D. Glatter
                                jdg@osen.us
                                700 Kinderkamack Road
                                Oradell, NJ  07649
                                Tel.: (201) 265 6400
                                Fax: (201) 265 0303